# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 27 2018, 7:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle Sheff
Sheff Law Office
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA DEPARTMENT OF CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:
CHILD ADVOCATES, INC.

Dede Kristine Connor
Child Advocates, Inc.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of B.K. (Minor Child) and B.S. (Father)

B.S. (Father),

*Appellant-Respondent,*

v.

September 27, 2018

Court of Appeals Case No. 18A-JT-944

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

Trial Court Cause No. 49D09-1704-JT-392

Indiana Department of Child
Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

*Appellee-Guardian ad Litem*

**Vaidik, Chief Judge.**

# Case Summary

[1] B.S. ("Father") appeals the termination of his parental rights to his daughter, B.K. ("Child"). We affirm.

# Facts and Procedural History

[2] Child was born premature on March 30, 2016. At the time of birth, Child tested positive for methamphetamine, amphetamine, cocaine, morphine, codeine, and marijuana due to D.K.'s ("Mother") drug use during pregnancy. Ex. 3; Tr. p. 9. Child spent approximately six weeks in the NICU due to withdrawal symptoms.[1]

---

[1] When Child was released from the hospital, she was placed with A.M., who at the time was dating Mother's cousin. Tr. pp. 15, 25; Ex. 18. At the time of the termination hearing, A.M. lived with her new girlfriend, who had custody of Child's younger brother Br.K., and A.M. planned to adopt Child. Tr. p. 15.

[3] On April 5, 2016, while Child was still in the NICU, the Indiana Department of Child Services (DCS) filed a petition alleging that Child was in need of services (CHINS). Ex. 3. The petition alleged that Mother had exposed Child to drugs while pregnant and that Father "has not successfully demonstrated an ability and willingness to appropriately parent the child, and he is unable to ensure the child's safety and well being while in the custody of [Mother]." *Id.* The petition also alleged that Father had a "substantiated history with [DCS] and a criminal history for drug-related charges." *Id.* The address for both parents was listed as Brendon Park Drive in Indianapolis. *Id.*

[4] An initial hearing on the CHINS petition was held the next day, April 6. Mother appeared, but Father did not. The juvenile court ordered DCS to "serve or publish as to [Father]" and reset the matter for a continued initial hearing on April 15. Ex. 5. In addition, Child was removed from the care of both parents.

[5] Father did not appear at the April 15 hearing. According to DCS, it had an address for Father's mother, but she said Father did not live with her and that she did not know his phone number. Ex. 8. DCS said it would "continue to attempt service" on Father. *Id.*

[6] Another continued initial hearing was held on April 29. Again, Father did not appear. DCS submitted an affidavit of diligent inquiry setting forth its efforts to locate Father and requested a default hearing, which was set for July 29. Ex. 9. DCS also filed a Praecipe for Summons by Publication. Ex. 10.

[7] In the meantime, a fact-finding hearing as to Mother was held on July 1. Mother admitted that Child was a CHINS because she could not provide a drug-free home for Child. The juvenile court found that Child was a CHINS and ordered Mother to participate in services. Exs. 11-13.

[8] The default hearing for Father was held on July 29. Father did not appear. The juvenile court found that DCS had "made diligent efforts to locate" Father. Ex. 15. Specifically, the court found that "before April 16," Father "got in touch with the FCM and was supposed to go to DCS to get served, but he did not." *Id.* In addition, the court found that "DCS published service by notification 3 times between the dates of 6/2/2016 and 6/16/2016," but Father did not "respond[] to the publication" or contact DCS. *Id.* In its default order, the court again found that Child was a CHINS but ordered that no services were to be provided to Father until he "appear[ed] in court or in the [DCS] Office to demonstrate a desire and ability to care for [Child]." *Id.*

[9] Due to Mother's failure to participate in services and positive drug tests as well as Father's failure to appear in the CHINS case, Tr. p. 12, in March 2017 the permanency plan for Child was changed from reunification to adoption, Ex. 18; Appellant's App. Vol. II p. 19. The next month, on April 27, DCS filed a petition to terminate Mother's and Father's parental rights to Child. Neither parent appeared at the initial hearings on April 28, May 12, and June 9. *Id.* at 24, 31, 33. At the June 9 hearing, DCS requested a default hearing because of the parents' failures to appear, and the court set it for September 12.

[10]     Both parents appeared on September 12, and an initial hearing was held on the termination petition. At the hearing, Father signed a summons and notice of hearing, which listed his address as being on Brendon Park Drive, and the juvenile court appointed attorneys for both parents. *Id.* at 35-36. On October 6, Mother and Father appeared for a pretrial conference, during which Father requested mediation. The court ultimately set mediation for January 11, 2018, and a final pretrial conference for January 19, 2018. However, neither parent appeared at the mediation or the final pretrial conference.

[11]     A hearing was held on the termination petition on March 27, 2018. Mother appeared, but Father did not. Father's attorney, who had not talked to Father since January, requested a continuance due to Father's absence:

> I would be asking for a continuance at this point in time, obviously my client is not here. . . . [Mother] indicated this morning that [Father] had . . . another Court hearing in a criminal matter that was preventing him from being here today. I did check My Case to try to confirm that and was . . . unable to confirm that but that's the information that she's provided . . . .

Tr. p. 4. The juvenile court denied Father's request for a continuance:

> I'll go ahead and deny your motion to continue, I mean, if it's something where, you know, he has a trial downtown or something, I mean, he could have contacted us. But, and there's documentation and I guess, you know, it[] always would be grounds for a motion to set aside but, we'll go ahead and go through with it today.

*Id.* at 5. DCS then moved to dismiss Mother, because she had signed a consent for Child to be adopted. The court granted DCS's motion to dismiss and proceeded with the hearing regarding Father.

[12] During the hearing, evidence was presented that on March 6, just twenty-one days earlier, Father pled guilty to Class A misdemeanor resisting law enforcement and Class A misdemeanor possession of cocaine and was sentenced to one year suspended. Tr. pp. 6-7; Exs. 30, 32, 33, & 34.[2] In addition, evidence was presented that Father had never seen Child since she was released from the hospital nearly two years earlier. Tr. p. 25.

[13] Alicia Parker, the Family Case Manager who had been assigned the case in August 2016, testified about her efforts to locate Father during the CHINS proceedings, including leaving messages through Mother, calling him, writing him at the Brendon Park Drive address, and searching the DCS database "MaGIK" in case there was a different address for him. *Id.* at 17-18; *see also* Ex. 8 (DCS also talked with Father's mother). FCM Parker testified that when she first met Father at the initial hearing in the termination case, he "instantly declined" a drug screen. Tr. pp. 11, 23; *see also id.* at 21 (testifying that when she first met Father at the initial hearing, he was offered services but declined). In addition, FCM Parker testified that she had interacted with Father at least four times and that he had never once asked to see Child. *Id.* at 16, 19. FCM

---

[2] Notably, the CCS in Father's criminal case lists his address as being on Brendon Park Drive. Ex. 30.

Parker concluded that it was in Child's best interests for Father's parental rights to be terminated.

[14] Likewise, Jessica Adams, who was appointed Child's guardian ad litem when the CHINS case was filed, testified that it was in Child's best interests for Father's parental rights to be terminated and for her to be adopted. GAL Adams explained that "throughout [her] being on this case [Father] ha[d] not been present or shown any willingness to want to reunify with [Child]." *Id.* at 32. GAL Adams also testified that she had interacted with Father in connection with the CHINS hearings for his son Br.K., who was born after Child, but that Father had never asked about Child. *Id.* at 33-34, 36-37. Father's attorney cross-examined both FCM Parker and GAL Adams.

[15] Following the hearing, the juvenile court entered an order terminating Father's parental rights to Child. The order provides, in relevant part:

> 6. Although it was thought that [Father] resided with [Mother], he could not be located to be personally served and he was served by publication.
>
> 7. [Child] was found to be in need of services as to [Father] on July 29, 2016. As part of the order, the Court found, in-part, that [Father] had been in contact with the IDCS prior to April 16, 2016, and was to go to its offices to be served, but did not.
>
> * * * * *
>
> 11. [Father] first appeared in court, regarding [Child], at an Initial Hearing in this termination action. He did not attend

[Child's] hearings held after that although he has attended CHINS proceedings pending on an after-born child[, Br.K.].

12. [Father] was offered a drug screen which he refused.

13. [Father] has not seen [Child] since before she was six weeks old, if ever.

14. On March 6, 2018, [Father] pleaded guilty to Resisting Law Enforcement, and Possession of Cocaine.

15. There is a reasonable probability that the conditions that resulted in [Child's] removal and continued placement outside the home will not be remedied by [Father]. [Father's] ability to parent remains unknown. He has demonstrated his unwillingness to parent by ignoring [Child] and [Child's] CHINS case since knowing about it in April of 2016, or almost two years.

* * * * *

17. [Child] has resided, and become bonded, in the same foster home since she was six weeks old. This placement is preadoptive.

18. Termination of the parent-child relationship is in the best interests of [Child]. Termination would allow her to be adopted into the only environment and family she has known, and have permanency there.

* * * * *

19. Jessica Adams has been [Child's] Guardian ad Litem since the beginning of her CHINS case. She believes it to be in

[Child's] best interests that [Father's] parental rights be terminated and [Child] be adopted.

Appellant's App. Vol. II pp. 78-79.

[16] Father now appeals.

# Discussion and Decision

[17] Father's brief touches on a lot of different topics, but the gist of his argument appears to be that he was "improper[ly] den[ied] [the] ability to present evidence at the termination hearing." Appellant's Reply Br. p. 6; *see also id.* at 7. In other words, Father claims that the juvenile court should have granted his motion to continue the termination hearing so that he could have presented evidence.

[18] Generally, the decision to grant or deny a motion to continue is within the sound discretion of the trial court, and we will reverse only for an abuse of discretion. *In re J.E.*, 45 N.E.3d 1243, 1246 (Ind. Ct. App. 2015), *trans. denied*. An abuse of discretion occurs when the trial court's conclusion is clearly against the logic and effect of the facts and circumstances before the court or the reasonable and probable deductions to be drawn therefrom. *Id.* When a motion to continue has been denied, an abuse of discretion will be found if the moving party has demonstrated good cause for granting the motion, but we will reverse the trial court's decision only if the moving party can show that he was prejudiced by the denial. *Id.*

[19]    Here, the record shows that Father appeared for hearings in the termination case on September 12 and October 6, 2017. A mediation was set for January 2018 at Father's request, but Father did not appear for that or the final pretrial conference. The last time Father's attorney spoke to him was in January. Father did not appear at the termination hearing on March 27, 2018. Although Mother claimed that Father was at a hearing in his criminal case, Father's own attorney said that there was no indication of this on the court docket.[3] Accordingly, the juvenile court denied the motion to continue but said that Father could file a motion to set aside if it turned out that he, in fact, had been at another hearing. Notably, the record does not indicate that a motion to set aside was filed after the juvenile court terminated Father's parental rights to Child. Father did not show good cause to the court. Even on appeal, Father does not say why he did not attend the termination hearing or set forth what evidence he would have presented had he been present. Accordingly, we cannot say that the court abused its discretion in denying Father's motion to continue the termination hearing.

[20]    To the extent that Father argues that his due-process rights were violated in the termination case because he "was not given notice of the CHINS proceedings," Appellant's Br. p. 21, we find no merit to this argument. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets

---

[3] Indeed, according to the CCS in Father's criminal case, there were no court proceedings after March 6, 2018. *See* Ex. 30.

the requirements of due process. *Hite v. Vanderburgh Cty. Office of Family &*
*Children,* 845 N.E.2d 175, 181 (Ind. Ct. App. 2006). Due process in parental-
rights cases involves the balancing of three factors: (1) the private interests
affected by the proceeding; (2) the risk of error created by the State's chosen
procedure; and (3) the countervailing government interest supporting use of the
challenged procedure. *Id.* There is no doubt that Father's private interest in his
parental relationship with Child is substantial. *See id.* Likewise, the
government's countervailing interest in protecting the welfare of children is also
substantial. *See id.* Thus, we focus on the risk of error.

[21] In its termination order, the juvenile court found that although DCS was not
able to personally serve Father in the CHINS proceedings, he was served by
publication. Appellant's App. Vol. II p. 78; *see also* Ex. 15 (CHINS default
order providing that DCS published service by notification three times). Father
does not challenge this finding or the fact that publication is an acceptable
method of service in CHINS cases. *See In re K.D.*, 962 N.E.2d 1249, 1257 (Ind.
2012) (noting that it is common for children to have absent or even unknown
parents and in those situations DCS can serve by publication and proceed to
default). In addition, the juvenile court found that Father knew about the
CHINS proceedings regarding Child as early as April 2016 (the same month
that the CHINS petition was filed) and was supposed to go to DCS's offices to
be served, but he did not. Appellant's App. Vol. II p. 78. Father also does not
challenge this finding on appeal. When Father finally appeared in the
termination case in September 2017, he declined services and never asked about

Child.  And although Father did not appear at the termination hearing, he was represented by counsel, who cross-examined DCS's witnesses.  Consequently, because Father knew about the CHINS proceedings shortly after Child's CHINS case was opened and DCS served him with notice of the CHINS proceedings by publication, there was not a substantial risk of error in the termination case in which Father appeared during the early stages and was represented by counsel at the hearing.  *See Hite*, 845 N.E.2d at 184 (determining that although the father did not receive notice of the original CHINS action or copies of the case plans, the risk of error was not substantial because he "was not denied the opportunity to be heard in the latter portions of the CHINS action and in the termination proceedings").[4]  We therefore affirm the juvenile court's order terminating Father's parental rights to Child.

Riley, J., and Kirsch, J., concur.

---

[4] Father also argues that the evidence is insufficient to support the termination of his parental rights to Child because the juvenile court "based its [f]indings as to the statutory factors for termination upon DCS's conjecture and speculation" that he was unable to parent.  Appellant's Reply Br. p. 6.  The juvenile court found that although Father's parenting skills were unknown, Father had "demonstrated his unwillingness to parent by ignoring [Child] and [Child's] CHINS case since knowing about it in April of 2016, or almost two years."  Appellant's App. Vol. II p. 79.  Thus, even if Father had parenting skills, he chose not to use them with Child.  The evidence supports the termination of Father's parental rights to Child.